## McFADDEN v ALLSTATE INSURANCE COMPANY

Docket No. 81973. Submitted January 15, 1986, at Detroit. Decided October 7, 1986. Leave to appeal applied for.

Gary McFadden was injured in an accident while working in the course of his employment on a mobile crane. The crane is powered by a motor and rolls on wheels. The crane is a dual function unit, having a "highway" mode and a "pick" mode. The accident occurred on private land. Plaintiff thereafter sought personal protection insurance benefits from Allstate Insurance Company, his personal no-fault insurer. Defendant denied the claim and plaintiff thereafter brought an action in the Wayne Circuit Court seeking a judgment ordering the payment of the benefits. The trial court, Harold M. Ryan, J., held, following a bench trial, that the crane was a "motor vehicle" because it was designed for highway operation when in its highway mode and that it was operated "as a motor vehicle" at the time of plaintiff's injury. The court held that the defendant was liable to the plaintiff in the amount of $15,375.27 and entered a judgment and order to that effect. Defendant appealed.

The Court of Appeals *held:*

1. The crane was not being operated upon a public highway at the time of plaintiff's injury.

2. The crane was not in its highway mode at the time plaintiff sustained his injuries. Thus, it was not at that time designed for operation upon the highways and was not a motor vehicle within the meaning of MCL 500.3101(2)(c); MSA 24.13101(2)(c).

3. A vehicle from which injuries arise must be operated on the highway or be designed for operation on the highway at the

REFERENCES

Am Jur 2d, Automobile Insurance §§ 229, 230, 232.

What constitutes a "motor vehicle" covered under no-fault insurance. 60 ALR3d 651.

Validity and construction of "no-fault" automobile insurance plans. 42 ALR3d 229.

time of the injury in order for recovery of personal protection benefits.

4. The crane was not in use as a motor vehicle under the facts of this case.

Reversed.

1. INSURANCE — NO-FAULT INSURANCE — PERSONAL PROTECTION BENEFITS — MOTOR VEHICLE.

A motor vehicle must be operated on the highway or be designed for operation on the highway at the time of the injury in order for a plaintiff to recover personal protection insurance benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of the motor vehicle as a motor vehicle (MCL 500.3101[2][c], 500.3105[1]; MSA 24.13101[2][c], 500.13105[1]).

2. INSURANCE — NO-FAULT INSURANCE — MOTOR VEHICLE.

A motor vehicle is defined for purposes of the no-fault automobile insurance act as a vehicle, including a trailer, operated or designed for operation upon a public highway by power other than muscular power which has more than two wheels; the fact that a vehicle might be functional on a highway in an extreme emergency is not dispositive of whether it was designed for highway operation (MCL 500.3101[2][c]; MSA 24.13101[2][c]).

*Lopatin, Miller, Freedman, Bluestone, Erlich, Rosen & Bartnick* (by *Richard E. Shaw*), for plaintiff.

*Garan, Lucow, Miller, Seward, Cooper & Becker, P.C.* (by *James L. Borin*), for defendant.

Before: HOOD, P.J., and J. H. GILLIS and J. M. BATZER,* JJ.

PER CURIAM. Defendant appeals from a judgment for plaintiff entered by the trial court subsequent to a bench trial. The trial judge held that defendant, as plaintiff's no-fault insurer, was liable to plaintiff for personal protection insurance benefits in the amount of $15,375.27.

Plaintiff was injured in an accident on Ford

---

* Circuit judge, sitting on the Court of Appeals by assignment.

Motor Company property in Flat Rock while working on a mobile crane.

The mobile crane at issue is powered by a motor and rolls on wheels. The crane is equipped with a loading block and boom at all times.

In its "travel mode" the crane travels on the highway, by special permit, at speeds of from thirty to forty miles per hour. Once at the job site, the vehicle is immobilized; outriggers are placed and hydraulically activated to stabilize the crane during "picking" operations. Seventy-five thousand pounds of counterweights are placed on the crane to further stabilize it during the "pick."

To prepare for highway travel after a "pick," the boom is locked in position, the outriggers are withdrawn, and the counterweights are removed.

After the "pick" in the instant case, the outriggers were withdrawn and the boom was locked in place. The mobile crane was then driven, with counterweights in place, one hundred yards, across a nearby road, to ready the crane for highway travel in its "travel mode." It was during the "off-loading" of the counterweights that plaintiff sustained injuries for which he sought no-fault personal protection insurance benefits. MCL 500.3105(1); MSA 24.13105(1).[1]

Defendant moved for summary judgment prior to trial, pursuant to GCR 1963, 117.2(3), arguing

---

[1] Apparently, there is no dispute between the parties with respect to the parked vehicle provision of the no-fault act, MCL 500.3106; MSA 24.13106. Specifically, plaintiff and defendant apparently agree with the trial court that plaintiff's injury falls within the exception of § 3106(1)(b). Because not presented to this Court as an issue on appeal, we express no opinion on the application of the exception to the case at bar. We do note that by virtue of 1981 PA 209, codified at MCL 500.3106(2); MSA 24.13106(2), effective January 1, 1982, subsequent to plaintiff's cause of action, personal protection insurance benefits are no longer available to one in plaintiff's position because plaintiff sustained his injury in the course of his employment and workers' compensation benefits were available and have been made available in this case.

that personal protection insurance benefits were not properly payable because the mobile crane was not a "motor vehicle" within the meaning of § 3101(2)(c) of the no-fault act. MCL 500.3101(2)(c); MSA 24.13101(2)(c). Specifically, defendant claimed that the mobile crane was not a motor vehicle because it was not designed *primarily* for highway travel or, alternatively, that the mobile crane was not a motor vehicle because it was not designed for highway travel with the counterweights in place.

Subsequent to trial, the trial court denied defendant's motion for summary judgment, rejecting its claim that a vehicle must be designed primarily for highway use in order to be a "motor vehicle" as contemplated by § 3101(2)(c). Relying on *Johnston v Hartford Ins Co,* 131 Mich App 349, 351; 346 NW2d 549 (1984), lv den 419 Mich 893 (1984), the trial court found that the crane was a "motor vehicle" because it was designed for highway operation in its travel mode, and that the mobile crane was operated "as a motor vehicle" at the time of plaintiff's injury, as evidenced by plaintiff's testimony that the crane had just traveled one hundred yards prior to the accident.

MCL 500.3105(1); MSA 24.13105(1) provides that an insurer is liable to pay personal protection insurance benefits for accidental bodily injury "arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle."

At the time of plaintiff's injury, "motor vehicle" was defined in MCL 500.3101(2)(c); MSA 24.13101(2)(c) as

> a vehicle, including a trailer, operated or designed for operation upon a public highway by power other than muscular power which has more than 2 wheels. Motor vehicle does not include a

motorcycle or a moped, as defined in section 32b of Act No. 300 of the Public Acts of 1949.[2]

The mobile crane was not, in fact, operated on a public highway at the time of plaintiff's injury. Thus, our inquiry is limited to whether it was *designed* for operation upon a public highway.

Whether we review the record deposition testimony under the standard for review of denial of a motion for summary judgment pursuant to GCR 1963, 117.2(3); *Rizzo v Kretschmer,* 389 Mich 363, 372; 207 NW2d 316 (1973), or plaintiff's testimony under the standard for review of a trial court's findings following a bench trial, MCR 2.613(C); *Precopio v Detroit,* 415 Mich 457, 466; 330 NW2d 802 (1982), we conclude that at the time plaintiff was injured, the mobile crane was not in its mode designed for operation on the highway. The fact that a vehicle might be "functional" on a highway "in an extreme emergency" is not dispositive of whether it was *designed* for highway operation. *McDaniel v Allstate Ins Co,* 145 Mich App 603; 378 NW2d 488 (1985); *Ebernickel v State Farm Mutual Automobile Ins Co,* 141 Mich App 729; 367 NW2d 444 (1985), lv den 422 Mich 971 (1985).[3]

In *Johnston,* this Court held that an injury arising from the operation of a mobile crane which was materially indistinguishable from the crane at bar, when totally immobilized for a "pick," was not an injury arising from the use of a motor vehicle "as a motor vehicle" as required by

---

[2] MCL 500.3101(2)(c); MSA 24.13101(2)(c) has since been amended to exclude from the definition of "motor vehicle" tractors and other implements of husbandry not subject to registration requirements of the Vehicle Code.

[3] We have inserted as an Appendix a portion of the deposition testimony of Jack Schmalzried, equipment superintendent of Laramie & Sons, plaintiff's employer at the time of the accident, and plaintiff's trial testimony, pertinent to the crane's capacity for highway travel with its counterweights in place.

§ 3105(1). This Court found that the mobile crane was clearly designed to operate on a public highway, and thus was a motor vehicle per § 3101(2)(c), but concluded that because the mobile crane could not be operated on the highway in its immobile state, it was not being operated "as a motor vehicle" at the time of the injury. We differ slightly with the *Johnston* Court's construction of the statute. However, we also disagree with the trial court's application of *Johnston* to the facts at hand.

As we stated earlier, since the mobile crane was not operated upon a public highway at the time of plaintiff's injury, our focus is on the question of whether it was designed for operation upon a public highway. It was so designed, but *only* when in its highway configuration or mode. It was not in its highway mode at the time plaintiff sustained his injuries. Thus, it was not at that time designed for operation upon the highways and was not a motor vehicle within the meaning of § 3101(2)(c).

Moreover, § 3105(1) permits recovery for personal injuries "arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle." Differing slightly from the *Johnston* Court, we believe that the § 3105(1) term "arising out of" sets forth a temporal circumstance for determining whether a vehicle is a "motor vehicle" *as well as* for determining, as the *Johnston* Court held, whether it is operated "as a motor vehicle."

The most important rule of statutory construction is to discover and give effect to the legislative intent. *In re Certified Questions*, 416 Mich 558, 567; 331 NW2d 456 (1982). We do not believe that the Legislature intended that a vehicle with several separate design functions, only one of which is highway travel, maintains its status as a motor

vehicle at all times regardless of its operative function at the time of injury. Conversely, substituting the alternative definition of "motor vehicle," we do not believe it could be seriously contended that an off-the-highway injury arising from a vehicle not designed for highway travel is compensable under § 3105. See, e.g., *Pioneer State Mutual Ins Co v Allstate Ins Co,* 417 Mich 590, 596; 339 NW2d 470 (1983). We hold that a vehicle from which injuries arise must be operated on the highway or be designed for operation on the highway *at the time of the injury* in order for recovery of § 3105 benefits.

Applying this panel's construction of the statute to the facts before us, we conclude that plaintiff was not entitled to no-fault personal protection insurance benefits.

To avoid misinterpretation of the ramifications of our decision not to align ourselves with the *Johnston* panel, we note that our decision is in harmony with *Johnston,* where the Court stated at 360-361:

> A too technical approach, *i.e.,* one dictating that, once a dual-purpose vehicle has been ruled a motor vehicle, it is a motor vehicle at all times and for all purposes, would destroy the intent of the statute and create undesirable results. A common sense approach, however, dictates that *the intention of the Legislature was to limit the act's coverage here to motor vehicles whose function at the time of the accident was one compatible with that of a motor vehicle.* The intent of the Legislature should not be defeated by a technical or forced interpretation of the statutory language. *Grand Rapids Motor Coach Co v Public Service Comm,* 323 Mich 624, 635; 36 NW2d 299 (1949).
>
> *Under this analysis, once a dual-function unit has been converted to a sole nonlocomotive function, it should fall outside the liability statute.*

Plaintiff's argument that refusal to treat the crane as a motor vehicle would be inconsistent with the parked vehicle statute is not persuasive. A dual-function unit which has not been converted, *e.g.,* one which is merely parked or stopped while functioning under its motor vehicle design, would still be a parked vehicle under MCL 500.3106; MSA 24.13106. Thus, interpreting the "as a motor vehicle" language to relate to the function of a vehicle at the time of an accident *should impose liability with respect to a dual-function unit only when in use in its locomotive function.* Converted solely to its other function, the unit would fall outside the statute. A dual unit operating as both would fall within the motor vehicle liability provision. [Emphasis added.]

Like the *Johnston* Court, we decline to impose liability with respect to the dual function unit in the case sub judice because it was not in its locomotive function. Our only difference with the *Johnston* panel is that that panel would consider the mobile crane *at all times* to be a motor vehicle, while we would not. But even were we to consider the mobile crane to have been at all times a motor vehicle under § 3101(2)(c) as per *Johnston,* like *Johnston* we would not hold it to be in *use* "as a motor vehicle" under the facts here. Thus, under either panel's construction, we would conclude that the trial court's judgment was in error.

Accordingly, the judgment of the trial court is reversed.

### APPENDIX

Jack Schmalzried, equipment superintendent of Laramie & Sons, plaintiff's employer at the time of the accident, testified, by deposition, as follows concerning the crane's capacity for traveling on the highway with the counterweights in place:

*Q.* [*Mr. Dickinson, Plaintiff's Counsel*] And when you say in its immobile mode, the crane, even with seventy-five thousand pounds of counterweight on it can move; can it not?

*A.* It can move, but it cannot move down the highway.

*Q.* It could move, it was possible to move down the highway?

*A.* Under an extreme emergency condition.

*Q.* I am not talking about extremes. I am talking about, it was physically possible to move down the highway with seventy-five thousand pounds of counterweight on it?

*A.* I would not say at a high rate of speed, or at a rate of speed that you would be asking for too much weight on your planetaries and your complete system.

*Q.* My question is, it is possible for it to move down the highway to be in a mobile fashion?

*Mr. Borin:* [*Defendant's Counsel*] On a public highway with seventy-five thousand pounds on it of counterweights.

*A.* It could be run but—

*Q.* [*Mr. Dickinson*] That is all I am asking. It could be run, whether you want to take the risk or not, it could be run; correct?

*A.* It could be run, yes, but there would be a tremendous risk involved.

*Q.* It might be a rougher ride with the extra counterweight on the tail?

*A.* You would probably involve in a steering problem.

*Q.* You might have a steering problem, and you might not be able to go as fast as you would without the counterweights; correct?

*A.* Right.

*Q.* But you still could move?

*A.* You could move, yes.

Plaintiff's testimony at trial also revealed that the crane can be operated on the highway with the

counterweights in place, but that such operation is not ordinary:

> *Q. [Mr. Borin, Defendant's Counsel]* There was a separate truck that came along with the 75,000 pounds of counterweights, is that correct?
>
> *A.* That's correct.
>
> *Q.* And as far as you knew, in your entire career with Laramie, you had never seen a 3900 operated on the public highways on the streets of Detroit, in the State of Michigan, counterweighted with 75,-000 pounds, had you, sir?
>
> *A.* Yes, I have.
>
> *Q.* You have seen that done?
>
> *A.* Yes, I have.
>
> *Q.* When did you see it done?
>
> *A.* To give you an actual date, I cannot, but I can give you the situation.
>
> *Q.* Okay.
>
> Was it a situation where the pick was being done on the street?
>
> *A.* That was one situation, yes.
>
> *Q.* In other words, I don't know if you saw it up here at the Renaissance Center, they were doing a pick about a week and a half ago, and they actually had this thing on the streets, on the public highway, counterweighted, but they were doing the pick, is that right?
>
> *A.* That was the crane.
>
> *Q.* I am talking about driving it from the yard out to such a situation as you had in February of 1979, when you had to drive twenty, fifteen, twenty miles to the construction site, is that right?
>
> *A.* Yes.
>
> Yes, sir, I have seen it driven out from where our yard was located out to this train derailment in Dearborn, approximately ten miles with the counterweights loaded.
>
> *Q.* Was it permitted, was it an emergency situation?
>
> *A.* It was an emergency situation.

*Q.* Okay.

You have never seen a permit drawn by the State of Michigan to drive a counterweighted crane on the public highways, have you?

*A.* No, sir, I have not.

* * *

*Q.* Mr. McFadden, as I gather from all of the testimony that I have heard from you, you recognize that in certain circumstances, the vehicle that we are talking about, the 3900 T Mannitar Crane, can be driven on public highways?

*A.* Yes.

*Q.* You have seen that done and you have done that yourself, is that correct?

*A.* Yes, sir.

*Q.* All right.

At the time that you were removing the counterweights, the 75,000 pounds of counterweights, you were not operating the vehicle on the public highway, were you?

*A.* No, sir.

*Q.* And the fact of the matter is, sir, that except for the isolated situation in an emergency set of circumstances, this particular vehicle and the configuration that existed at the time of your accident was not meant for operation on the public highway, isn't that correct, sir?

*A.* I guess you could say that, yes.

* * *

*Q.* [*Mr. Dickinson, Plaintiff's Counsel*] At the time of your accident, after the pick had been done, the vehicle could have been operated on a public highway, could it not?

*A.* Yes, sir.

*Q.* In its particular configuration at that time?

*A.* After it was undressed, is what you are saying.

*Q.* Yes.

*A.* Oh, most definitely.

*Q.* Okay.

It could have been on the public highway; it could have been operated; it might have had a lot of counterweights on it, but it could have been driven?

*A.* Oh, yes, it could have handled the road. It could have been functional.